**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEORGE GONZALES, Derivatively on Behalf of Nominal Defendant TELIGENT, INC., | Case No. 1:20-cv-5448 |
| Plaintiff, | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JASON GRENFELL-GARDNER, STEVEN KOEHLER, CAROLE BEN-MAIMON, JOHN CELENTANO, BHASKAR CHAUDHURI, JAMES C. GALE, and THOMAS J. SABATINO, JR., | |
| Defendants, | |
| and | |
| TELIGENT, INC., | |
| Nominal Defendant. | |

Plaintiff George Gonzales ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Teligent, Inc. ("Teligent" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and contribution for violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Teligent with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

1

## I.     NATURE AND SUMMARY OF THE ACTION

1.      Teligent researches, develops, produces, supplies, and sells generic pharmaceutical products, primarily topical ointments and lotions. As a generic company, Teligent derives its profits by selling a large number of low-margin products and by entering the market early with one of the first generics.

2.      To market its products, it must submit an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA") demonstrating that the Company has complied with stringent controls and procedures for the safety of the treatment and the integrity of the supporting data. Accordingly, the Company submitted 11 ANDAs in 2014, 15 ANDAs in 2015, and 12 in 2016.

3.      Between March and November 2017, Teligent claimed that its sole facility in Buena, New Jersey complied with relevant regulations concerning the controls for manufacturing facilities and the required testing procedures.

4.      However, in reality, the FDA had inspected the facility in September 2016 and documented a range of compliance failures. Despite the Company's stated commitment to rectify these issues, the FDA's subsequent inspections in October 2017 and April/May 2019 found the same and additional problems with the controls and manufacturing practices.

5.      On November 6, 2017, Teligent reported disappointing results for third quarter 2017 and revised its fiscal 2017 guidance as "a result of the knock-on effect of ANDA approval delays." The Company also disclosed "manufacturing challenges" such as "particles that had the potential to adulterate [its] finished goods."

6.      On this news, the Company's share price fell $2.29, or nearly 44%, to close at $2.96 per share on November 7, 2017.

7.      These revelations precipitated the filing of a securities class action in this District against Teligent and certain of its former officers, captioned *Oklahoma Police Pension Fund and Retirement System v. Teligent, Inc., et al.*, Case No. 1:19-cv-03354-VM (the "Securities Class Action").

8.      On June 17, 2020, U.S. District Judge Victor Marrero issued an order in the Securities Class Action denying defendants' motion to dismiss. In the order, Judge Marrero held that a claim for securities fraud had been stated against Teligent and certain of its officers. It is now a virtual certainty that Teligent will incur significant liability due to the fiduciary breaches committed by defendants when they issued misleading statements about the Company's facility.

9.      Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of seven members, six of whom are named in this action.  As alleged herein, five of these directors issued misleading statements that failed to disclose that Teligent had received a letter from the FDA documenting the Company's failure to comply with relevant controls and manufacturing regulations.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.   JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### Plaintiff

12.    Plaintiff George Gonzales purchased shares of Teligent stock in October 2017 and has continuously owned his Teligent stock since that date.

### Nominal Defendant

13.    Nominal Defendant Teligent is a Delaware corporation with its principal executive offices located at 105 Lincoln Avenue, Buena, New Jersey 08310.  The Company stock trades on the NASDAQ Stock Exchange under the symbol "TLGT."

### Defendants

14.    Defendant Jason Grenfell-Gardner ("Grenfell-Gardner") served as the Chief Executive Officer ("CEO") and President of the Company from July 2012 to February 2020. Grenfell-Gardner is a defendant in the Securities Class Action.

15.    Defendant Steven Koehler ("Koehler") has served as a director of the Company since 2014. In fiscal 2017, he was Chair of the Audit Committee.

16.    Defendant Carole Ben-Maimon ("Ben-Maimon") has served as a director of the Company since 2016.

17.    Defendant John Celentano ("Celentano") has served as a director of the Company since 2015. In fiscal 2017, he was a member of the Audit Committee.

18.    Defendant Bhaskar Chaudhuri ("Chaudhuri") has served as a director of the Company since 2010. In fiscal 2017, he was a member of the Audit Committee.

19.    Defendant James C. Gale ("Gale") has served as a director of the Company since 2009 and as Chairman of the Board since 2014.

20.     Defendant Thomas J. Sabatino Jr. ("Sabatino") has served as a director of the Company since September 2017.

21.     The defendants named in ¶¶ 14-20 are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

22.     By reason of their positions as officers, directors, and/or fiduciaries of Teligent and because of their ability to control the business and corporate affairs of Teligent, at all relevant times, the Individual Defendants owed Teligent and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Teligent in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Teligent and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Teligent and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Teligent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Teligent, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

24.     To discharge their duties, the officers and directors of Teligent were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Teligent were required to, among other things:

     (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

     (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

     (c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

     (d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Company Overview and Applicable Guidelines

25.    Teligent researches, develops, produces, supplies, and sells generic pharmaceutical products, primarily topical ointments and lotions. As a generic company, Teligent derives its profits by selling a large number of low-margin products and by entering the market early with one of the first generics.

26.    To market its products, it must submit an Abbreviated New Drug Application ("ANDA") with the FDA demonstrating that the Company has complied with stringent controls and procedures for the safety of the treatment and the integrity of the supporting data. The supporting data for ANDA approval must show that the generic has the same characteristics as, works in the same way as, and can consistently be produced to replicate the innovator drug it is copying.

27.    The "FDA will refuse to approve an ANDA" if, among other things, "[t]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the

drug product are inadequate to ensure and preserve its identity, strength, quality, and purity." 21 C.F.R. § 314.127(a)(1).

28.     Moreover, a generic producer must adhere to certain "minimum" methods and controls to "assure" that a treatment for human consumption has the safety, identity, and other characteristics that the treatment "purports or is represented to possess." 21 C.F.R. § 210.1(a). These minimum standards, called good manufacturing practice or "cGMP", include testing, quality control, and laboratory controls. 21 C.F.R. §§ 210.3(b)(12) & 211.160-176. Additionally, the "good laboratory practice for nonclinical laboratory studies," or "GLP," govern "nonclinical laboratory studies that support or are intended to support applications for research or marketing permits for products," i.e. ANDAs, and are "intended to assure the quality and integrity of the safety data filed" therewith. 21 C.F.R. § 58.1(a). Producers must also adhere to specialized methods and controls when running certain complex tests supporting ANDAs, such as the test establishing the "bioequivalence" or overlap between the generic and the innovator, to ensure the integrity of the resulting data. 21 C.F.R. § 320.

29.     Standard operating procedures ("SOPs") mandated by GMP assure drug quality, identity, and purity when generating the data to support ANDA. 21 C.F.R. §§ 211.100(a), 314.127(a)(1). SOPs are required for laboratory and production controls, such as product specifications, testing, sampling plans, and the handling of products to prevent contamination. 21 C.F.R. §§ 211.80(a), 211.160, 211.166. GLP also separately requires SOPs. 21 C.F.R. §58.81. SOPs require tracking deviations from specifications, investigations into such deviations, and reporting corrective action to a company's management. Adhering to the foregoing standards and regulations are costly: for example, the FDA estimated the annual record-keeping burden of 21 C.F.R. § 211.100(b), which requires documenting compliance with written procedures and

recording and justifying any deviations, to be 25,104 hours. Creating 25 new SOPs might, per the FDA's estimation, take 20 hours per person and 50,000 hours in one year. (Rules and Regulations, 76 Fed. Reg. 188 (Sept. 18, 2011)).

30.     In 2014, Teligent began to significantly scale-up its core topical ANDA submissions and simultaneously launch a series of new business:

(a)     First, the Company would attempt to develop injectable, complex, and ophthalmic generic drugs in addition to topicals. The topical generics market was more competitive, so Teligent sought better returns from its other product lines. The Company used the acronym "TICO" for each of the four product lines to refer to this "broader strategy."

(b)     Second, Teligent began purchasing a large number of ANDAs or the rights thereunder to become familiar with the three new product lines. The Company purchased one topical ANDA in 2013 and 20 ANDAs and NDAs in September 2014, almost all of which were for injectable drugs.

(c)     Third, the Company planned to significantly expand its headquarters in Buena, New Jersey (the "Buena Facility"), where it had facilities for R&D, nonclinical laboratories, and manufacturing, along with executive offices. This expansion would increase the facility's topical manufacturing capacity and enable production of the more complex products in the TICO strategy, such as a sterile facility to manufacture injectable treatments, because producing injectables through third-party manufacturers was generally cost-prohibitive.

31.     In October 2015, the Company changed its name to Teligent. In 2016, after several years of growth, Teligent still only had about 150 employees. Meanwhile, Teligent's R&D costs more than doubled, from approximately $2.8 million in 2012 and 2013 to over $6.9 million in

2014, or over 20% of Teligent's total revenues. R&D costs continued to balloon over the following years, reaching over $17 million and approximately 26% of total revenue in 2016.

32.     Accordingly, the Company submitted 11 ANDAs in 2014, 15 ANDAs in 2015, and 12 in 2016. However, FDA inspections showed that the Company had failed to ensure data and product integrity, including by failing to investigate or reject out-of-specification results, have or follow appropriate SOPs, keep records, validate methods, and prevent contamination.

**B.      FDA Investigations and Warning Letters**

33.     The FDA inspected the Buena Facility on three occasions: September 2016, October 2017, and April/May 2019.

34.     Following each investigation, the FDA reported its findings in a Form 483 or a 483 Letter, which are "issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations" of the applicable statute and regulations. Each observation listed in the 483 letter must be "clear, specific and significant." A 483 Letter "does not include observations of questionable or unknown significance at the time of the inspection."

35.     Moreover, at the end of an inspection, the inspector will discuss each observation "with the company's senior management" so that "there is a full understanding of what the observations are and what they mean."  Following at least the first two investigations, the FDA also issued an Establishment Inspection Report ("EIR"), which elaborates upon the observations in the 483 Letters, described discussions with senior management, and included other comments from the inspector. In addition, following at least the first investigation, the FDA sent a follow-up letter to Teligent emphasizing its compliance failures.

### 1.     September 2016 483 Letter

36.     Between September 12 and 16, 2016, the FDA's Office of Study Integrity and Surveillance of the Division of Generic Drug Bioequivalence Evaluation conducted an unannounced "pre-approval" inspection at the Buena Facility.

37.     The 483 letter recorded the following observations showing that Teligent's manner of conducting tests required for ANDA approval was fundamentally flawed:

(a)     the method for measuring certain "concentrations in study samples used only a single concentration . . . that was not representative of the range of . . . concentrations" at issue and "no separate quality control samples were used to evaluate [the] accuracy and precision" of the test;

(b)      "[q]uality control samples representing the range" of certain concentrations at issue were also "not included in the HPLC [i.e. high-performance liquid chromatography] analysis," which identifies and quantifies a material's component parts;

(c)     the stability studies on certain solutions were "not evaluated with a fresh calibrator solution[,]" meaning that Teligent did not run quality control checks against the full range of characteristics that the solution may have and, when running the study, did not refresh the calibrator solution with samples representing that full range.

38.     The 483 letter also recorded that Teligent had not stored data and records to substantiate the information submitted for ANDA approval:

(a)     "[t]he firm did not randomly select and retain reserve samples" from product samples it was testing to show that the product purportedly was bioequivalent to the innovator treatment it was attempting to copy; and

(b)     "[t]he drug accountability records" for the sample products used in the bioequivalence studies "were insufficient to reconstruct the receipt, storage, handling, and use of these products".

39.     The EIR explained that the observations in the 483 letter were the result of a complete absence of required SOPs. Under the section titled "Facilities and Site Operations," the EIR concluded:

(a)     "[t]he SOP program is not adequate and current to ensure quality in analytical operations and the generated in-vitro study data";

(b)     "[t]he sample receipt and accountability processes were not adequate to ensure the integrity of the sample usage during the study";

(c)     "[t]here were no SOPs for reserve samples, sample accountability and storage of drug products"; and

(d)     "[t]he firm does not have a standard operating procedure for sample receipt and accountability."

40.     On October 5, 2016, Teligent responded with a letter stating that the Company "takes these observations extremely seriously" and acknowledging that, "any FDA inspection is limited in its scope, and therefore, the observations cited may not be all inclusive." In addition, the letter acknowledged that Teligent used "inappropriate" test methods, that it "failed to use quality control samples" to appropriately check tests, and that it had a "gap" in its SOPs. Teligent promised to draft and implement multiple new SOPs and to repeat the in-vitro bioequivalence study it had previously submitted in support of an ANDA under new and much more rigorous protocols.

41.     In a letter addressed to Grenfell-Gardner dated February 21, 2017, the FDA "inform[ed him] of objectionable conditions observed during the U.S. Food and Drug

Administration (FDA) inspection conducted at Teligent Pharma, Inc., from September 12 to September 16, 2016," which "raises concerns about the validity and integrity of the studies conducted at your study site." Though the letter was "not intended to be an all-inclusive list of deficiencies," it warned:

> From our review of the FDA Establishment Inspection Report, the documents submitted with that report, and your written response to the Form FDA 483, we conclude that you did not adhere to the applicable statutory requirements and FDA regulations governing the conduct of BE studies. We wish to emphasize the following:
>
> You failed to meet the regulatory requirements for retention of reserve samples for bioavailability or bioequivalence studies [21 CFR 320.63 and 320.38].
>
> *      *      *
>
> You are responsible for ensuring that your site adheres to all requirements of law and all FDA regulations that are relevant to studies of FDA-regulated products conducted at your site. You should address these deficiencies and establish procedures to ensure that any ongoing or future studies will be in compliance with FDA regulations.

42.     The FDA inspector discussed the observations in the 483 Letter and the EIR with senior Teligent executives, including Steve Richardson, the Chief Scientific Officer and a direct report to Grenfell-Gardner, and others involved in quality control, quality assurance, and analytics.

### 2.     October 2017 483 Letter

43.     Between October 2 and 19, 2017, the FDA inspected the Buena Facility following ANDA submissions and a Field Action Report related to a product recall.

44.     A 483 letter following the inspection documented:

(a)     "Laboratory controls do not include the establishment of scientifically sound and appropriate specifications designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity";

(b)     "[e]stablished laboratory control mechanisms are not followed[,]" and, consequently, "confirmed Out of Specification results are not further investigated as per the laboratory investigation SOP";

(c)     the "firm failed to conduct investigations properly for [ANDA] application products." Specifically, where a test or sample "failed to meet [a] specification," an "[i]nvestigation into [such] failures are not performed or not performed adequately," which impermissibly leaves the reason for the failure unidentified, citing three ANDAs where this had occurred;

(d)     "[t]esting and release of drug product[s] do not include appropriate laboratory determination of satisfactory conformance to the final specifications," citing an incident for "submission batches" of a potential product that Teligent provided to the FDA in support of an ANDA;

(e)     Teligent used test methods whose suitability "have not been established," raising doubts about the data they produced and citing three ANDAs submitted in 2015 and 2016; and

(f)     "a failure to handle materials in a manner to prevent contamination," citing an incident in 2016 where Teligent knowingly allowed a "Lot" of contaminated product to be shipped into interstate commerce.

45.     In an EIR, the FDA elaborated on the observations noted in the 483 letter, as well as other problems in Teligent's laboratory and production practices. Teligent apparently failed to conduct investigations into "exhibit batches" used to generate data for ANDAs, even though the Company's own SOP required investigation into the root causes of out-of-specification ("OOS") results. Instead, for the "pre-approval application," the Company confirmed that OOS results

existed for exhibit batches and declared that the investigation was closed without actually performing one. As such, Teligent hastily submitted ANDAs without the requisite process and investigation.

46.     In a response to the FDA on November 6, 2017, Teligent admitted that many of the FDA's observations were accurate, acknowledging for example that "[i]investigation into [OOS] failures are not performed or not performed adequately," and that "Out of Specification results are not further investigated as per the laboratory investigation SOP" to determine their root cause. Moreover, "quality control (QC) laboratory out of specification (OOS) investigations of Exhibit batches were concluded when the OOS results were confirmed; no manufacturing investigation." Though the "findings of the OOS investigation was reported to the R&D team for further evaluation and action, but no follow up was deemed required by QA [quality assurance] or QC." Teligent also employed the "same" impermissible practice "for deviations during manufacturing that were not investigated immediately by the production department." In the response, the Company also acknowledged that it did not have an SOP to "ensure that any laboratory test method being used in the laboratory has been previously validated or verified."

47.     Teligent affirmed its commitment to correct these compliance issues within five months. Doing so, and especially within five months, as the Company claimed it would do, would require dedicating resources to complete an overhaul of Teligent's processes: SOPs, other laboratory controls, production and process controls, training, and hiring.

48.     The EIR notes that the FDA inspector discussed the observations in the 483 Letter and the EIR with senior Teligent executives, including direct reports to Grenfell-Gardner, and that the FDA investigator met with Grenfell-Gardner during the inspection.

### 3.    May 2019 483 Letter

49.    Between April 22 and May 20, 2019, the FDA inspected the Buena Facilities' Laboratory Control System, Quality System, and Production System.

50.    The corresponding 483 letter cited 10 compliance failures, including that many of the previously-identified deficiencies had not been remediated. Specifically, the 483 letter noted the following continued compliance failures:

(a)    "Drug products failing to meet established specifications are not rejected";

(b)    "Investigations of a failure of a batch or any of its components to meet any of its specifications did not extend to other batches of the same drug product";

(c)    "Laboratory records are deficient in that they do not include a statement of the results of tests and how they compare to the established specifications";

(d)    "Written records are not always made of investigations into the failure of a batch or any of its components to meet specifications"; and

(e)    "The written stability testing program [SOP] is not followed".

51.    It also identified compliance failures regarding quality and production practices, such as that the Company failed to timely file Field Action Reports, if at all, for significant OOS results and that it failed to follow procedures for handling complaints and annual product reviews. It further failed to establish control procedures to monitor manufacturing processes, causing variability in the characteristics of drug products, and to make records associated with drug products available for authorized inspection.

52.    On June 4, 2019, Teligent responded to the FDA, acknowledging that the compliance issues identified in September 2016 and October 2017 still had not been fixed. The Company promised to undertake more radical mediation efforts and to update its SOP yet again, including an overhaul of its root cause investigatory practices for OOS results.

53.     Specifically, Teligent admitted that it lacked sufficient personnel to comply with the Laboratory Controls and other regulations designed to ensure the integrity of data it submitted in support of ANDAs. The June 2019 letter promised that Teligent was finally making a "concerted effort to staff the organization appropriately." Teligent further conceded that "[a]ll" of its "overdue activities" – including the "complaint investigations" – were the result of its serious staffing issues, stating that the Company:

(a)     had not been relying on "permanent employees"

(b)     was "hiring a Quality Compliance Director, who will be responsible for all shop floor and laboratory audits. This staffing addition will not only ensure that all non-conformances are recorded and appropriately investigated, but it will allow us to contemporaneously mentor and coach"

(c)     had made new hires in the "Quality group within the past twelve (12) months and we have hired a new Vice-President of Operations and a new Vice-President of Quality in order to add industry experience, knowledge, and expertise to our organization"

(d)     had "[i]ncreased Quality presence on the floor auditing, training, and mentoring, which will allow for the review of many internal processes and departments, including the laboratories"

(e)     was nevertheless "currently analyzing our workload and comparing this data to staffing levels in the laboratory and across the company in order to enhance our visibility to these types of issues" because of continued compliance failures; and

(f)     is "assembling a stability workload extrapolation matrix that will provide us with the number of analysts required at various production levels."

**C.     The Individual Defendants Issue False and Misleading Statements**

54.     On March 7, 2017, the Individual Defendants caused Teligent to issue a press release announcing its fourth quarter and full year 2016 financial results. For fiscal 2016, the Company reported revenue of revenue of approximately $67 million, an increase of 51% over fiscal 2015, and a net loss of approximately $12 million, compared to net income of approximately $6.7 million the previous year. Telligent had submitted 12 ANDAs to the FDA, half of which were in the fourth quarter, and received nine ANDA approvals. Additionally, for fiscal 2017, Teligent provided revenue guidance of between $85 to $100 million, a projected increase of 27% to 49% as compared to fiscal 2016.

55.     The same day, the Company held a conference call to discuss the financial results. During the call, defendant Grenfell-Gardner touted the Company's pipeline[1]:

> As of year-end 2016, our pipeline at FDA had a total addressable market for Quintiles IMS of $2 billion. This pipeline that Teligent has built we believe is a rather unique asset and I want to be certain that we all understand how this pipeline sets Teligent apart from much of the rest of our peer group in the generic industry. You may recall that I referred to Teligent as the disrupter in our industry early in 2016. What I meant by that was that ***Teligent's ability to navigate drugs through the approval process at FDA in a timely manner and launch them successfully makes us a little bit different. We're not so much playing defense trying to protect our installed markets, but rather playing offence as we launch new drugs into the market.*** That's why if you compare our results to those of our peers, a few key differentiators stand out. First, ***we invest significantly more in R&D and we get significantly more out of it.***
>
> *              *              *
>
> Second, ***we punch above our weight when it comes ANDAs on file with the FDA, particularly in the specialty generic space***. And finally, because we are market entrants rather than incumbents, we don't face the same pricing erosion that our competitors do.

---

[1] Unless otherwise stated, all emphasis is added throughout.

56.     Similarly, defendant Grenfell-Gardner claimed that the investment in R&D would enable Teligent to shift to injectable products, which offer greater returns and less competition than the Company's core topical products. Specifically, he stated, in relevant part:

> We've begun the process of transitioning our R&D focus from topicals to injectables, which will be largely complete by the fourth quarter of this year. We're able to do this as by the fourth quarter, ***we will have substantially achieved our goals around our topical development program with topical ANDAs becoming more focused on applications which require in-depth clinical endpoint studies.***
>
>         *        *        *
>
> [W]e will continue to invest in R&D, as we maintain our aggressive focus on the pipeline. We anticipate the total R&D expense for the year 2017 to approximate 24% to 27% of total revenue. Our investment in this pipeline is what drives and will continue to drive our growth and profitability in the years to come.

57.     He also stated that Teligent's imminent move to injectable products was a result of the purported progress on updating its plant:

> We've been making great strides in the build out of our facility expansion at the manufacturing site in Buena Vista Township, New Jersey. We are on track to have the facility finished and validated by the end of this year, which will enable us to hit our timelines for in-house injectable ANDA submissions by the first half of 2018.

58.     Grenfell-Gardner emphasized that Teligent's performance and positioning was based on Defendants' strong execution in developing generic products and timely ensuring their approval:

> ***[W]e're committing to continuing our extreme focus on execution. We believe in developing drugs, getting them approved, and launching them in the market, all in a timely manner.*** We believe this is the foundation of a sound specialty generic pharmaceutical business and we are absolutely dedicated to executing this business plan whilst continuing to manage our cost structure and our supply chain. That's what we do best at Teligent.

59.     The six ANDA submissions in the fourth quarter of fiscal 2016 were "a little bit light," as an analyst noted on the call. Rather than disclosing the problems underlying the ANDA

pipeline and the 483 letter Teligent had received in September 2016, defendant Grenfell-Gardner

stated, in relevant part:

> So I think we intentionally didn't want to start thinking about numbers of filings in the year, but rather the quality of the filings and their likelihood of approval within our first cycle review. That's our focus as we think about the pipeline.
>
> And you go back and look at the fourth quarter of 2016, I think you can see some of that. We actually responded to, I think the final total was something like 120 interactions with FDA related to the pipeline last year. So when you think about that workload, together with new ANDA submissions, obviously, ***getting stuff out of the FDA is probably more important than throwing stuff into the FDA, particularly if you don't have the time and the effort to quality check it.***
>
> ***We don't want to do that.*** So the other piece of this is to be mindful that in the first half of this year, you have the overlap of the review cycle periods for GDUFA Year 4 and GDUFA Year 5. You'll know, Matt, that in GDUFA Year 5, we're moving from a 15-month clock for first cycle review to a 10-month clock.
>
> So that puts a lot of strain and stress on the organization and the regulatory team and all of the teams that support to make sure that we can continue to respond to FDA on time, in a complete manner and in a quality response to the information requests that they have. That's my number one priority for the first half of this year.
>
> So we've staggered the ANDA filings. There will, of course, still be ANDA filings in the first half of this year. And we'll update you on a quarterly basis as we progress. But I don't want to focus on that ANDA submission cadence. What I want to focus on is the quality of our responses to get drugs approved.

60.     When an analyst asked about the impact of competitors' plans for injectable

products, defendant Grenfell-Gardner assured that Teligent was not facing the regulatory problems

that other companies were experiencing. Specifically, he stated, in relevant part:

> You look at some of the major facilities that supply the market and they continue to have ongoing regulatory challenges. ***We've seen warning letters even over the course of the past few weeks related to sterile injectable manufacturing sites run by some of the largest companies in the world.***
>
> So, look I think that you've got to be mindful of a couple of things. First, there is a physical plant question, where you're going to make these sterile injectable drugs. I will tell you that many of the facilities that exist for sterile injectable manufacturer probably need to make some pretty significant investments around the manufacturing technology that supports that and that's not an easy thing to do.

*     *     *

We've been working on this injectable plan since 2014 when we acquired our first injectable ANDAs and NDAs. We brought the first of those drugs back to market. We've built a team, a really amazing team for injectable drug development. And we've started building the physical plant that will now be in place at the end of this year. ***That's a lot of work and a lot of process in a company that's very focused on getting stuff done. I'm not sure how in a slightly bigger or perhaps slower organization how that might happen quite to the extent that we do.***

61.    The above statements in ¶¶ 54-60 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

62.    On March 13, 2017, defendant Grenfell-Gardner participated at the Roth Capital Conference, where he claimed that, "We've had a very successful track record with the FDA in that facility. ***Our last three audits over the past five years, there have been no 483 observations at that site.***" Similarly, he assured investors that "our cooperation with the FDA has been incredibly fruitful and straightforward." To distinguish Teligent from its competitors entering the injectable products space, defendant Grenfell-Gardner claimed: "We've got the development capability. And we [have] the regulatory skills to take these products from thinking about to actually being available for patients."

63.    At the same time, with respect to Teligent's ANDA submission pipeline, defendant Grenfell-Gardner stated, "[i]f you think about the pace of the approvals that we had last year, the goal is to get as many into the FDA as we're getting out of the FDA." This growing pipeline impacted Teligent's fiscal 2017 guidance, as defendant Grenfell-Gardner stated, in relevant part:

Just to talk a little bit about the financial highlights for 2017, we've given guidance of revenue of between $85 million and $100 million for 2017. Just to say the way that we construct our guidance is to start with the low end of the range being a sort of universe of what we know. So, what have we had approved, might be pending launch, building on the last quarter of 2016. ***The upper end of that range is our expectations based on things we believe that could come out of FDA throughout the year, and we think that gives us a good starting point for the guidance for the year.***

In addition, we're continuing to invest significantly in R&D. Obviously, the base of sales is where it is. So, we invest significantly more as a percentage of revenue than our peers, but we're investing now 24% to 27% for 2017. That will moderate over time as the pipeline grows; that percentage will trend towards industry norms of around 10% as you get in the out-years of the model. ***But for now, that's the best investment that we can make because the FDA is approving the drugs that we submit.***

64.     The above statements in ¶¶ 62-63 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

65.     On March 15, 2017, the Individual Defendants caused Teligent to file its annual report on Form 10-K with the SEC for the period ended December 31, 2016 (the "2016 10-K"). The reports were signed by defendants Grenfell-Gardner, Koehler, Gale, Chaudhuri, Celentano, Ben-Maimon, as well as non-party director Narendra Borkar. Therein, the Company stated that it has "an FDA-registered, ***cGMP-compliant facility*** that is equipped for manufacturing topical, semi-solid and liquid products." It further stated, in relevant part:

> ***We may encounter delays in testing and manufacturing new pharmaceutical products, submitting applications for regulatory approval, receiving approval from the relevant authorities and commercializing new products.***

*        *        *

21

As a manufacturer of pharmaceutical products, we must also comply with cGMPs, or current Good Manufacturing Practices, which include requirements related to production processes, quality control and assurance and recordkeeping. Our manufacturing facilities and procedures and those of our suppliers are subject to periodic inspection by the FDA and foreign regulatory agencies. Any material deviations from pharmaceutical cGMPs or other applicable requirements identified during *such inspections may result in recalls or other enforcement actions, including warning letters, a delay or suspension in manufacturing operations, consent decrees or civil or criminal penalties.* Further, discovery of previously unknown problems with a product or manufacturer may result in restrictions or sanctions, including suspension or withdrawal of marketing approvals, seizures or recalls of products from the market, or civil or criminal fines or penalties, any of which could significantly and adversely affect supplies of our products.

66.     The above statements in ¶ 65 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

67.     On May 2, 2017, the Individual Defendants caused Teligent to issue a press release announcing its first quarter 2017 financial results. Therein, the Company reported that revenue had increased over the prior year period, including revenue derived from the products it had developed year-over-year. Two of the Company's ANDAs also received approval. Further, the Company maintained its revenue guidance of between $85 to $100 million for FY2017, with gross margins between 50% to 54%, and R&D costs between 24% to 27% of revenue.

68.     The same day, the Company held a conference call to discuss the financial results. During the call, defendant Grenfell-Gardner claimed that Teligent "is focused on delivering products in the existing product pipeline and responding to FDA and HealthCanada inquiries" and that it is "committed to upholding [its] responsibilities with respect to the FDA to ensure the timely

processing of [Teligent's] applications." He also claimed that the Company's business was "build on . . . excellent regulatory capabilities."

69.     Defendant Grenfell-Gardner maintained that Teligent was on track to handle injectable submissions by the first half of 2018. He stated:

> The goal, as I've said, in terms of facility expansion is to ensure that we have the facility. We're ready to produce injectable products by the end of this year, and the team has already identified the lead products that will go into that facility and what order as we get through the end of 2017 and into 2018.

70.     The above statements in ¶¶ 67-69 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

71.     On May 3, 2017, defendant Grenfell-Gardner participated at the Deutsche Bank Health Care Conference, where he stated: "If you look at the [Buena] manufacturing site, . . . It had a very solid track record with [the] FDA – *the audits conducted over the last five years, there've been no 483 observations related to the site*."

72.     The above statements in ¶ 71 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

73.     On May 16, 2017, defendant Grenfell-Gardner participated at the Bank of America

Merrill Lynch Healthcare Conference where he repeated that the Buena facility was compliant. He

stated, in relevant part:

> All of this we do pretty much internally through a facility that we have in New Jersey, it's an FDA [sic] approved site, **No 483 observations in the last three inspection cycles**, and it's a site that we're extending pretty rapidly in order to meet the demands of both at [sic] the pipeline as well as the strategy that we've set out.

74.     He also touted Teligent's purported ability to develop its pipeline and secure a

return on its high R&D costs:

> [Teligent] is really an offensive play around how we grow this pipeline and how we get products approved. You can see that over the course of the past five years, we've really invested a lot in that pipeline compared to our peers. **If you look at our run rate of investment in R&D, we're at somewhere north of 20% in most years, this year somewhere between 27% and 30% I think, for the year, or 24% and 27% for the year, and last year almost 27% as well.** That's a significant investment compared to industry, right. I mean, you look at an industry that's been investing 6%, 7%, 8% of revenue in R&D and have pipelines that look pretty anemic compared to many of our much larger brothers and sisters in this industry, Teligent has a very robust pipeline focused on the specialty area.
>
> *          *          *
>
> **And if you look at the ability of this team to file 10, 12, 15 ANDAs a year and to process the amount of FDA correspondence that comes from that successfully and in a timely manner, I think, we've done a really great job.**

75.     Similarly, defendant Grenfell-Gardner maintained that Teligent adhered to high

regulatory and quality control standards:

> If you look at a number of the folks in our space, you hear a lot of complaining about FDA, **you hear challenges of getting drugs approved. We don't make those complaints, we don't have those challenges**. . . . [P]art of this is about the responsiveness of the team that we have. I think last year, the count was that we had something like a 130-ish inbound increase from FDA, all of which required either 7-day or 30-day response times. We responded to FDA in all of those cases on time. And when we talk to our peers in our industry, they say to us, why are you doing this? This is crazy, like nobody does that. But the reason we do it is because that's what it takes to get drugs approved on your GDUFA goal date.

76.     In connection with the conference, defendant Grenfell-Gardner used a PowerPoint presentation, which reiterated that Teligent had a "[t]rack record of successful FDA audits," with "[t]hree audits conducted over the past 5 years (last audit in January 2016) with no 483 observations." It separately stated that its facility had "No 483 observations in the last three cGMP inspections" and that the Company's facility was "cGMP-compliant." The presentation also emphasized the Company's purported "[b]road Scope of Organic R&D Opportunities," including "to file approximately 14 more ANDAs for all commercially reasonable AT-rated products and AB-rated corticosteroids," and also "[d]evelopment program to expand to topical products requiring clinical end point studies. First two development programs have commenced."

77.     The above statements in ¶¶ 73-76 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

78.     On August 8, 2017, the Individual Defendants caused Teligent to issue a press release announcing its second quarter 2017 financial results.  Though it reported revenue increase over the prior year, Teligent had not received any ANDA approvals and had submitted two ANDAs during the quarter. For fiscal 2017, Teligent lowered its revenue guidance to between $75 million and $85 million and its gross margin guidance to between 47% and 50%.

79.     Regarding the lack of ANDA approvals, defendant Grenfell-Gardner explained, during a conference call held the same day, that: "Several of our pending ANDAs have been impacted by regulatory inspections at 3 of our API [Active Pharmaceutical Ingredient] *suppliers*,

25

infecting 8 molecules in 21 ANDAs, representing $745 million of our pipeline's total addressable market, or 37%." Specifically, those suppliers received "483 observations" from the FDA, and although several of those observations had recently been cleared, it "delayed" the approval time of the "impacted" Teligent ANDAs. This, along with changed market conditions for one approved product, "caused [the Company] to update [its] guidance for the year."

80.     He assured: "Looking ahead to coming months, we have reviewed the applications pending with the FDA and believe that there are approximately 10 potential approvals that we could anticipate before the end of the year with the total addressable market of $345 million."

81.     During the same call, regarding the Company's ability to withstand changes in the business cycle, defendant Grenfell-Gardner touted the Company's development capabilities and R&D investment, along with its ANDA pipeline and ability to get ANDAs approved by the FDA:

> The ability to get drugs approved. And the diversification that allows you to have a portfolio approach to that market. And I think that's what we have done in the topical piece. And you translate that to what's going on in injectables. In injectables we still see significant market disruption on a regular basis. That's what put us in this position with Zantac, it's put us from time to time in positions with some of the cephaelis forms. . . . What we do know is that FDA is being significantly more responsive. It is working through applications more quickly. And so for those of us who are in markets where **_we've developed these pipelines and these capabilities, I think we should benefit as they continue to get approved_**.

82.     The above statements in ¶¶ 78-81 were materially misleading because they failed to disclose that: (1) Teligent failed to implement the required controls and procedures; (2) that, as a result, the Company could not ensure the integrity of its data and its products to support ANDA approval; (3) that the FDA had notified the Company of these existing problems but Teligent had not remediated the compliance issues; and (4) that, as a result of the foregoing, the Company was likely to face delays in acquiring regulatory approval for its pipeline.

### D.     The Truth Fully Emerges

83.     On November 6, 2017, after the market closed, Teligent announced its third quarter

2017 financial results in a press release that stated, in relevant part:

- Total net revenues generated from the sale of our generic topical and injectable pharmaceutical products for the third quarters of 2017 and 2016 of $11.8 million and $13.9 million, respectively, a decrease of 15% over the same quarter last year.

- Total net revenues generated from contract manufacturing services and other income for the third quarters of 2017 and 2016 of $1.9 million and $2.3 million, respectively.

- Total net international revenues for the third quarters of 2017 and 2016 of $3.6 million and $2.7 million, respectively.

- Gross margin for the third quarter of 2017 equaled 24% as compared to 50% in the third quarter of 2016.

- Operating loss was $5.4 million in the third quarter of 2017, compared to operating income of $0.3 million in the same quarter in 2016. Operating loss was $4.2 million for the nine months ended September 30, 2017, compared to operating income of $2.2 million in 2016.

- Our operating results in the third quarter of 2017 include $4.6 million in research and development costs, compared to $4.0 million in the same quarter in 2016.

*        *        *

- The Company received approval for four ANDAs during the three months ended September 30, 2017 for the following products: Desonide Lotion, 0.05%, Erythromycin Topical Gel USP, 2%, Clobetasol Propionate Cream USP, 0.05% Emollient and, Triamcinolone Acetonide Cream USP, 0.1%. All of these products have been launched except Desonide Lotion, 0.05%, which is expected to be launched in the fourth quarter of 2017.  Desonide Lotion, 0.05% was submitted under a partnered development agreement by Teligent, Inc. with Impax Laboratories, Inc.

84.     It also stated, in relevant part:

**Revised Full Year 2017 Financial Guidance**

27

- The Company now expects total revenue between $65 million and $67 million for the year ending December 31, 2017.

- As a result of revised total revenue, the Company now anticipates gross margin of 38% to 40% for the year ending December 31, 2017.

"This third quarter has been challenging for Teligent. ***These results and our revised outlook for the remainder of the year, are a result of the knock-on effect of ANDA approval delays*** and increased competition in one of our largest products," said Jason Grenfell-Gardner, President and Chief Executive Officer.

85. During a conference call the same day, defendant Grenfell-Gardner attributed the revised guidance as "almost entirely driven by pipeline delays." He stated, in relevant part:

I mean, there were expectations that we had of products that we believe were ripe for approval, that we have been pre-staging materials and inventory for, but then you'd come up with another sort of question and another cycle of review. That's the biggest impact to us in terms of the forecast.

86. As a result, defendant Grenfell-Gardner saw "potential for another couple of approvals throughout the rest of this year." He stated: "Of those 10 [expected ANDA approvals], I mean, certainly there are 4 there where I see minor complete response letters that really were often related to the [supplier's] sites that we talked about earlier or other sort of minor issues."

87. He also disclosed that "our team faced manufacturing challenges, [including] an excipient in a high-volume product that was being provided to us with particles that had the potential to adulterate our finished goods," seemingly referring to the contaminated product observed in 483 letters. He explained that "the team spent a significant amount of effort in resolving these challenges." As a result, "the engineering expenses related to the fix contributed to lower-than-anticipated margins in the quarter."

88. Teligent's ability to diversify into other lines of the TICO strategy were also delayed. Rather than validating its facility by the end of 2017 and submitting ANDAs for injectables within the first half of 2018, the Company only had "goal[s]" of "produc[ing] the first

lots to support pre-approval inspection in the second quarter [of 2018]" and "hav[ing] product available in the market by the fourth quarter of 2018."

89.     On this news, the Company's share price fell $2.29, or nearly 44%, to close at $2.96 per share on November 7, 2017.

## VI.     DAMAGES TO THE COMPANY

90.     As a direct and proximate result of the Individual Defendants' conduct, Teligent has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)     Legal fees incurred in connection with the Securities Class Action;

b)     Any funds paid to settle the Securities Class Action; and

c)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Teligent.

91.     In addition, Teligent's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

92.     The actions complained of herein have irreparably damaged Teligent's corporate image and goodwill.  For at least the foreseeable future, Teligent will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Teligent's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.     Plaintiff brings this action derivatively in the right and for the benefit of Teligent to redress injuries suffered, and to be suffered, by Teligent as a direct result of breaches of fiduciary duty by the Individual Defendants and for contribution for violations of Section 10(b) of the

Exchange Act of 1934.  Teligent is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.     Plaintiff will adequately and fairly represent the interests of Teligent in enforcing and prosecuting its rights.

95.     Plaintiff has continuously been a shareholder of Teligent at times relevant to the wrongdoing complained of and is a current Teligent shareholder.

96.     When this action was filed, Teligent's Board of Directors consisted of defendants Ben-Maimon, Celentano, Chaudhuri, Gale, Koehler, and Sabatino and non-party director Timothy B. Sawyer.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Non-Party Timothy Sawyer**

97.     Sawyer serves as Teligent's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Sawyer derives substantially all of his income from his employment with Teligent, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  As a result, Farhat would be interested in a demand asking him to investigate and sue his fellow directors, and demand is futile as to him

**Defendants Koehler, Celentano, and Chaudhuri**

98.     Koehler, Celentano, and Chaudhuri served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its disclosures, and its compliance with laws and regulations.  As alleged herein, Koehler, Celentano, and Chaudhuri failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Teligent's SEC

filings and other disclosures, and failed to ensure remediation of the control deficiencies identified by the FDA.  Thus, Koehler, Celentano, and Chaudhuri breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon**

99.     Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon each are responsible for the issuance of the misleading disclosures and omissions about Teligent's core business in the 2016 10-K, having signed and issued the 10-K. When Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon signed the 2016 10-K, they knew that the Company had received a 483 letter from the FDA documenting certain compliance failures. By intentionally issuing disclosures that warned of the possibility of receiving a warning letter, while omitting to disclose that the Company had *already received a 483 letter*, Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon breached their fiduciary duties and face a substantial likelihood of liability.

100.     Demand is also excused as to defendants Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon with respect to the contribution claim against defendant Grenfell-Gardner.  If Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon were to sue Grenfell-Gardner for his wrongdoing as set forth herein, they would be acknowledging that the Company's results were misleading and that material information about Teligent's core business was concealed from investors.  Because Koehler, Gale, Chaudhuri, Celentano, and Ben-Maimon actually knew of material negative developments related to Teligent's core business, they would acknowledging their own wrongdoing by suing Grenfell-Gardner.  As a result, they could not disinterestedly consider a demand to sue Grenfell-Gardner for contribution.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Teligent's business and affairs, particularly with respect to issues as fundamental as public disclosures.

103.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Teligent.

104.    In breach of their fiduciary duties owed to Teligent, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

105.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

106.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Teligent has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**Against Grenfell-Gardner for Contribution
for Violations of Sections 10(b) and 21D of the Exchange Act**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    Defendant Grenfell-Gardner is named as a defendant in the related securities class action.  The conduct of this Defendant, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

109.    Teligent is named as a defendant in related securities class actions that allege and assert claims arising under §10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Teligent is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from this Defendant in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

110.    As officers, directors and otherwise, Defendant Grenfell-Gardner had the power or ability to, and did, control or influence, either directly or indirectly, Teligent's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5.

111.    Defendant Grenfell-Gardner is liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

112.    Defendant Grenfell-Gardner has damaged the Company and are liable to the Company for contribution.

113.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Teligent, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Teligent and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Teligent;

D.    Directing Teligent to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Teligent and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Teligent's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Teligent to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Teligent has an effective remedy;

F.      Awarding to Teligent restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.


Dated: July 15, 2020                    By: <u>Benjamin I. Sachs-Michaels</u>
                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Benjamin I. Sachs-Michaels
                                        712 Fifth Avenue
                                        New York, New York 10019
                                        Telephone: (212) 935-7400
                                        E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Counsel for Plaintiff George Gonzales*

DocuSign Envelope ID: 1A110FCB-278F-4297-8645-3F95099FB9EA

## <u>VERIFICATION</u>

I, George Gonzales, do hereby verify that I am a holder of common stock of Teligent, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Date: 7/14/2020

DocuSigned by:

*George Gonzales*

D7DA5F2965F5454...

George Gonzales